1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   JEROME J. MACK,                    )   Case No.: 1:15-cv-01600 - JLT
                                        )
12              Plaintiff,              )   ORDER GRANTING DEFENDANTS' MOTIONS
                                        )   FOR SUMMARY JUDGMENT
13         v.                           )
                                        )   ORDER GRANTING PLAINTIFF'S REQUEST TO
14   CALIFORNIA DEPARTMENT OF           )   CONSIDER HIS UNREDACTED COPY OF HIS
     CORRECTIONS AND REHABILITATION,    )   OPPOSITION[1]
15   et al.,                            )
                                        )   (Docs. 100, 101, 106)
16              Defendants.             )
     _____)

17

18         Jerome Mack asserts he suffered discrimination and retaliation while an employee of the

19   California Department of Corrections and Rehabilitation.  (Doc. 93)  The CDCR and Kim Holland,

20   former warden of California Correctional Institution, seek summary judgment pursuant to Rule 56 of

21   the Federal Rules of Civil Procedure.  (Docs. 100, 101)  For the following reasons, Defendants'

22   motions for summary judgment are **GRANTED**.

23   ///

24   ///

25   ///

26   _____

27          [1] Due to his spam filter, Mr. Mack's attorney did not timely review the Court's order denying his request to file
     his opposition under seal.  Thus, his filing of his unredacted opposition was not timely.  However, there was no opposition
28   to the Court considering the unredacted version and the Court finds no prejudice would result and the interests of justice
     require it.  Thus, the Court **GRANTS** the request (Doc. 106)

                                                   1

## I.    Background and Undisputed Facts[2]

Plaintiff is an individual who has self-identified as both "Hispanic" and "Afro-American", as he his mother is "Mexican" and his father is "black." (DSF 6; Mack Depo. 58:13-14) He began working for the CDCR as a correctional officer on September 29, 1986. (Mack Depo. 46:3-4, 55:1-3) He was first employed at the facility in Vacaville, after which he worked at the Wasco, San Quentin, Lancaster, and Pelican Bay. (Mack Depo. 55:24-56:25) In April 1999, Plaintiff "took a promotional opportunity" to become a correctional sergeant and he transferred to the California Correctional Institution ("CCI") in Tehachapi, California. (Mack Depo. 57:1-6) He remained at this location through the end of his employment with the CDCR. (*See* DSF 2)

Defendant Kim Holland began holding the position of Warden at CCI "in either a permanent or acting capacity, [on] May 30, 2012." (Doc. 54 at 2, Holland Decl. ¶ 1) As Warden of CCI, "Holland had final approval on a host of personnel decisions at CCI, including but not limited to issuance of: Direct Actions, permanent promotions, acting time promotions, out of class assignments, Cease and Desist letters and Redirection letters reassigning staff to different positions." (PSF 13) According to Plaintiff, "Holland was the decision-maker who initiated … three adverse actions against him" while she was Warden of CCI. (DSF 30)

In June 2013, Plaintiff "documented allegations of staff misconduct concerning [his] immediate supervisors David Mason, Correctional Lieutenant and Brad Sanders, Correctional Captain." (Doc. 59 at 2, Mack Decl. ¶ 6)

On December 19, 2013, Plaintiff "requested a lateral transfer to the California Men's Colony and was initially approved by Defendant Holland." (Doc. 59 at 2, Mack Decl. ¶ 7) However, the transfer was ultimately denied "based on Defendant Holland's direction to inform CMC of a pending investigation." (PSF 14) To Plaintiff's knowledge, no investigation was pending at that time. (*Id.*) Nevertheless, "beginning in January 2014, CDCR investigated a hospital nurse's allegation that [Plaintiff] had fallen asleep while guarding an inmate who was receiving treatment." (DSF 16; RJN,

---

[2] The parties failed to file a joint statement of undisputed facts. This forced the Court to synthesize the Defendants' Statement of Facts (Doc. 100-4) and Plaintiff's Statement of Facts. (Doc. 102-5). The Court refers only to facts or portions thereof that are not disputed, or to facts that are deemed undisputed based upon failure to identify evidence that a genuine dispute of fact exists. Any fact identified by Defendants that was undisputed by the evidence is identified as "DSF." Any fact identified by Plaintiff that is undisputed by the evidence is identified as "PSF."

Exh. 1) "As a result of this investigation, CDCR reduced [Plaintiff's] salary by five percent for six months, effective in March 2015." (DSF 17; RSJ, Exh. 1) The California State Personnel Board ("SBP") sustained the adverse action, finding Plaintiff's "conduct constituted inexcusable neglect of duty as well as other failure of good behavior under California Government Code section 12572." (DSF 18-19) Plaintiff did not seek further review of this decision. (Doc. 87 at 2-4)

On February 15, 2014, Plaintiff applied for a position as Acting Correctional Lieutenant at CCI. (Doc. 59 at 2, ¶ 9) According to Plaintiff, the application was denied by Holland "based on a supposed pending personnel action when to his knowledge one did not exist." (PSF 15)

Plaintiff was informed that he was "ineligible for [the] lateral transfer" to CMC in April 2014. (Doc. 59 at 2, Mack Decl. ¶ 13) Approximately two weeks later, Plaintiff "filed an EEOC/DFEH Charge Intake Form with the EEOC, citing discrimination and retaliation, referencing Defendant Holland and a number of other Management level CCI individuals." (*Id.*, ¶ 14) The charge specifically "alleged that Holland had denied him a lateral transfer to another CDCR prison and an 'acting' Lieutenant position at CCI on the basis of his race, African-American." (DSF 38)

"[B]eginning in June 2014, CDCR investigated allegations that [Plaintiff] had refused to work with a Correctional Officer because she was a woman." (DSF 20) Plaintiff contends that Holland issued a direct action after the Office of Internal Affairs declined to investigate. (Doc. 102-2 at 6, Mack Decl. ¶ 49-55) Plaintiff was issued a letter of reprimand for this investigated conduct, although the Skelly hearing officer recommended a reversal of discipline. (DSF 21; Doc. 102-2 at 7, Mack Decl. ¶ 54) Plaintiff appealed the adverse action to the SPB, which sustained the adverse action. (DSF 22-23) Once again, Plaintiff did not challenge this decision. (Doc. 87 at 2-4)

"On or about June 14, 2014, [Plaintiff] documented an EEO training incident to Defendant Holland, in which [Plaintiff] indicated he felt like he was being retaliated against and treated differently because he had filed an EEOC/DFEH Charge." (PSF 39) Plaintiff also included "concerns over humiliating comments made by Lieutenant Knowles about a purported investigation of Sergeant Mack on or about April 24, May 15/16, and June 13, 2014, as well as the February/ March 2014 Acting Correctional Lieutenant post [that was] initially offered to Sergeant Mack but then rescinded." (*Id.*)

On June 25, 2014, CDCR's Equal Employment Coordinator issued a "Cease and Desist"

3

Memorandum to Plaintiff, Garcia, Sanders, and Mason. (PSF 40) The "Cease and Desist" directed them to "refrain from any interaction other than work-related necessity." (*Id.*)

On July 15, 2014, Plaintiff had an interview at Ironwood State Prison for a position promoting him to Correctional Lieutenant. (*See* PSF 18; Doc. 59 at 3, Mack Decl. ¶ 23) He was not offered the position and Plaintiff attributes this to Holland "having CCI staff indicate to Ironwood personnel that there was a pending personnel investigation into [Plaintiff]." (*See* PSF 18) At that time, the investigations into allegations that Plaintiff slept on the job and refused to work with a correctional officer because she was a woman were still ongoing, and decisions had not been issued. (*See* DSF 16-27, 20-21)

On August 8, 2014, the CDCR "began investigating allegations that [Plaintiff] had left his post without permission." (DSF 25; RJN Exh. 3) As a result of this investigation, the CDCR reduced Plaintiff's pay "by five percent for ten months, effective August 14, 2015." (DSF 26) Plaintiff appealed this decision to the SPB, which sustained the adverse action, finding Plaintiff's "conduct constitute[d] legal cause for discipline" for "inexcusable neglect of duty," "insubordination," "discourteous treatment of the public or other employees," "willful disobedience, and … other failure of good behavior." (DSF 27-28; Doc. 100-5 at 60) Again, Plaintiff did not challenge this decision. (Doc. 87 at 2-4)

On August 12, 2014, Plaintiff "attended a Whistle Blower Retaliation hearing in Fresno California at the State Personnel Board (SPB)." (Doc. 59 at 4, Mack Decl. ¶ 30) In addition, on August 19, Plaintiff "received a Temporary Re-Direction notification indicating that [he] was being temporarily re-assigned pending a personnel investigation / EEO investigation until further notice (*Id.* at 3-4, ¶ 31)

In "March/April 2016," Holland denied Plaintiff "an acting Lieutenant position [that] Acting Captain Crounse had recommended [Plaintiff] be given." (PSF 20) The only individual "on the list to be offered [the] acting position by Holland had not filed a grievance or made any complaints" similar to those made by Plaintiff. (*Id.*) At that time, an adverse action was pending against Plaintiff for leaving his post without permission. (DSF 25-28)

With each Skelly hearing "associated with the Adverse Actions issued to [Plaintiff] while at

CCI, [Plaintiff] requested that the matter be sent to an outside hiring authority … to review for fairness and equality in light of the EEOC/DFEH charges Sergeant Mack had filed." (PSF 29)  Holland denied each of the requests.  (PSF 30)

Plaintiff "had very little contact" with Holland while she was the Warden at CCI (DSF 10), and Holland retired from CDCR in August 2016.  (DSF 41) Plaintiff reported "they had only a few brief conversations," during which "Holland did not say anything to [Plaintiff] alluding to his race or ethnicity, or to the race or ethnicity of any other person."  (DSF 12)  Holland also did not "make any disparaging or negative comments to [Plaintiff] of any kind."  (DSF 13)

"On September 15, 2016, [Plaintiff] housed a 'Sensitive Needs Yard' ('SNY') inmate in a cell with a 'General Population' ('GP') inmate."  (DSF 43)  SNY inmates are those "who may be vulnerable to attacks by other inmates and, for their personal safety, are housed separately from the prison's general population."  (DSF 44)  After Plaintiff housed the SNY and GP inmates together, a "GP inmate physically attacked [an] SNY inmate."  (DSF 45)  "Correctional staff responding to the incident had to use pepper gas to separate the two inmates."  (DSF 46)

In about September 2016, Pat Vazquez became Acting Warden at CCI.  (Doc. 100-11 at 2) She "immediately initiated an investigation" regarding the circumstances that gave rise to the SNY inmate being celled with a GP inmate.   (DSF 42, 47)  The same day as the incident, Plaintiff was "directed to participate in an interview about the incident."  (DSF 48)  In addition, he "was temporarily relieved of his custodial duties and assigned to the mailroom effective September 15, 2016."  (DSF 49) This reassignment was "consistent with CDCR's policy of removing a peace officer from his or her custodial duties pending an investigation into a serious policy violation involving inmate safety." (Doc. 100-11 at 3, Vazquez Decl. ¶8)  Plaintiff retired from the CDCR the same day.  (DSF 53)

On January 20, 2017, Plaintiff filed his Fourth Amended Complaint in this action, including additional allegations concerning his reassignment to the mailroom on September 16, 2016.  (Doc. 93 at 22-24)  The Fourth Amended Complaint remains the operative pleading in this action.  In it, Plaintiff identifies the following six causes of action: (1) discrimination in violation of Title VII, (2) a hostile work environment in violation of Title VII, (3) retaliation for protected activities in violation of Title VII, (4) discrimination in violation of 42 U.S.C. § 1981, (5) retaliation in violation of 42 U.S.C. §

1981, and (6) retaliation in violation of 42 U.S.C. § 1983. (*See id.* at 18-22)

## II.     Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In addition, Rule 56 allows the court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). The moving party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to

present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

## III. Evidentiary Objections

In evaluating a motion for summary judgment, the Court examines the evidence provided by the parties, including pleadings, deposition testimony, answer to interrogatories, and admissions on file. *See* Fed. R. Civ. P. 56(c). Here, the parties make several objections to the evidence presented in support of and in opposition to the pending motions for summary adjudication.

### A. Plaintiff's Objection[3] (Doc. 102-1)

Pat Vazquez, who was the Acting Warden at CDCR's California Correctional Institute in September 2016, provided a declaration in support of Defendants' motions for summary judgment. (Doc. 100-11) Plaintiff objects to this declaration, as well as any "facts solely supported by the [d]eclaration," on the grounds that Ms. Vazquez was not disclosed as a witness prior to the close of discovery. (Doc. 102-1 at 1, citing Fed. R. Civ. P. 26(a), 37(c))

#### 1. Disclosure Requirements

Pursuant to Rule 26(a) of the Federal Rules of Civil Procedure, a party must identify "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses…" Fed. R. Civ. P. 26(a)(1)(A)(i). Following the initial disclosures, a party must

---

[3] Plaintiff objected to the declarations of Pat Vazquez and James Robertson. (Doc. 102-1 at 1) Because the defendants withdrew the declaration of Mr. Robertson (Doc. 105-3 at 2, n. 1), the objection to his declaration is moot. Accordingly, Court addresses only the declaration of Ms. Vazquez.

supplement the witness list in a timely manner if the party learns the disclosure "is incomplete or incorrect, and if the additional…. information has not otherwise been made known to the other party during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Rule 37(c) "gives teeth" to the disclosure requirements of Rule 26(e) "by forbidding the use on a motion or at trial of any information required to be disclosed by" that rule, unless the party's failure to disclose the required information is substantially justified or harmless. *See Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir.2001).

 2.   Analysis

Plaintiff asserts Ms. Vazquez was first identified as an individual "having knowledge of events occurring in 2016" through the Second Amended Rule 26 Disclosure served on January 17, 2018. (Doc. 102-1 at 2, Allen Decl. ¶¶ 2-3)  Plaintiff argues that because Ms. Vazquez was not "part of any Rule 26 disclosure submitted before the close of discovery," her declaration should be stricken pursuant to Rule 37(c).  (Doc. 1-2 at 2)

In response, Defendants contend the declaration "is admissible and should not be excluded" under Rules 26 and 37.  (Doc. 105-3 at 5)  According to Defendants, after Plaintiff filed a Fourth Amended Complaint in January 2017—including allegations related to a reassignment and end of his employment with the CDCR in September 2016— the "CDCR promptly amended its Rule 26 disclosure to describe and produce documents clearly identifying Vazquez as a key participant in the events leading up to [Plaintiff's] retirement on September 16, 2016." (*Id.*)  The documents produced included a memorandum to Ms. Vazquez regarding an incident and allegation of misconduct that occurred in September 2016.  (*See* Doc. 105-4 at 8, Gosling Decl. ¶ 3; Doc. 105-3 at 48)  In addition, the discovery produced by Defendants included a memorandum to Plaintiff from Ms. Vazquez, in which she identified her findings regarding the allegations of misconduct.  (*See* Doc. 105-3 at 28)

Further, "a memorandum from Pat Vazquez to Mr. Mack, dated September 16, 2016, advising him that she was temporarily reassigning him to the mailroom pending a personnel investigation," was marked as an exhibit during Plaintiff's deposition.  (Doc. 105-3 at 8, Gosling Decl. ¶ 4) At that time, Plaintiff "testified that he had received this memorandum and, indeed, had acknowledged receipt of it when it was delivered to him on September 16, 2016." (*Id.*, citing Mack Depo. 232:16- 233:3 [Doc.

8

105-3 at 107])

Significantly, the documents produced by Defendants in the course of discovery clearly indicate Ms. Vazquez had knowledge of the events addressed in Plaintiff's Fourth Amended Complaint. Because the duty supplement a witness list under Rule 26(e) applies only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," Defendants were not required to supplement their Rule 26(a) disclosures simply for the purpose of identifying Ms. Vazquez as a witness. *See Tumbling v. Merced Irrigation Dist.*, 2010 U.S. Dist. LEXIS 101404 at *56057 (E.D. Cal. Sept. 27, 2010). Accordingly, the Court finds Rule 37 sanctions are not implicated. Plaintiff's objections to the declaration of Ms. Vazquez, as well as the facts supported by the declaration, are **OVERRULED**.

**B.      Defendants' Objections (Doc. 105-1)**

Defendants object to many paragraphs in Plaintiff's declaration, asserting that he has filed a sham declaration. In addition, Defendants argue that Plaintiff makes statements lacking foundation or personal knowledge, offers legal conclusions, and discusses matters not relevant to the issues before the Court. (*See generally* Doc. 105-1)

        1.      Sham Affidavit Rule

Under the "sham affidavit" rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). The Ninth Circuit explained, "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* Because of the jury's role in resolving questions of credibility, courts have urged caution when applying the sham affidavit rule. *Id.* (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (explaining the sham affidavit rule has limited application "because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment").

To determine whether a declaration should be stricken as a sham, the Ninth Circuit requires the court to "make a factual determination that the contradiction was actually a 'sham,'" and created

specifically to avoid summary judgment. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). In addition, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998-99. The Court explained that "minor conflicts between [a declarant's] earlier deposition testimony and subsequent declaration... do not justify invocation of the sham affidavit rule." *Id.* at 999.

### a. Whether Plaintiff discussed his ethnicity with co-workers at CCI

As Defendants observe, during the first day of his deposition, Plaintiff was asked: "Did you ever discuss with any of the people that you worked with at CCI what your ethnic background was?" (Doc. 100-6 at 66, Mack Depo. 59:22-23) In response, Plaintiff testified: "I – I'm not certain. I don't recall that. I'm not certain of that. I do recall though discussing it with another supervisor at another prison." (*Id.*, Mack Depo. 59:24-60:1) Plaintiff then clarified that the discussion about his ethnic background occurred while he worked at the Vacaville facility, at some point between 1986 and 1989. (*Id.* at 67, Mack Depo. 60:2-6)

Plaintiff now asserts in Paragraph 6 of his declaration, "At various points while at CCI, I discussed my race with other officers who self-identified and often appeared to be Black/African-American." (Doc. 102-2, Mack Decl. ¶ 6) Defendants contend this statement contradicts Plaintiff's testimony during the deposition, and should not be considered by the Court because Plaintiff "cannot contradict []his testimony with a sham declaration." (Doc. 105-4 at 2, citing *Kennedy v. Allied Mutual Insurance Co.*, 952 F.2d 262, 266 (9th Cir. 1991)) The Court agrees the statement in Plaintiff's declaration directly conflicts with his deposition testimony, in which he could only recall a conversation about his ethnicity occurring with a co-worker at Vacaville, not at CCI. Thus, the objection is **SUSTAINED** and Paragraph 6 of the declaration is **STRICKEN**.

### b. Recollection of incidents at CCI

During Plaintiff's deposition, he testified that he believed "[t]here is an underlying [sic] of racism within the California Department of Rehabilitation statewide." (Doc. 100-6 at 142, Mack Depo. 434:5-6) Plaintiff was asked to identify the "specific instances" supporting his assertion that he "felt like [he] was the darkest thing there and they let [Plaintiff] know it." (*Id.* at 141-46, 433:4-438:10) In response, Plaintiff said he "was called a white nigger... in the mid 90's" while working at Lancaster

and "was shown a Ku Klux Klan card [by] another officer" while he was working at Vacaville. (*Id.* at 142-143, 434:25- 435:18) In addition, Plaintiff reported that while he worked at Pelican Bay, he "only counted five [black people]" and on one occasion, the warden would not let him out of his office, stating "what happens at the bay stays at the bay." (*Id.* at 143, Mack Depo. 435:24-8) Plaintiff also said "a white correctional officer" told him in 1998 that "people like [Plaintiff]" were not hired around Pelican Bay and he "was never going to promote." (*Id.* at 144, Mack Depo. 436:22-437:6) Further, Plaintiff testified he "was called a nigger in an in-service training" when he transferred to CCI in April 1999. (*Id.* at 142, Mack Depo. 434:11-16) When asked if there were "[a]ny other instances" Plaintiff said he could not think of any, and he did not identify any events occurring at CCI after April 1999. (*Id.* at 145, Mack Depo. 437:7-8)

Opposing Defendants' motions for summary judgment, Plaintiff now seeks to identify additional instances at CCI "when others used racially derogatory and pejorative terms." (*See* Doc. 102-2, ¶¶ 9-10, 14-21) Defendants contend these statements should be stricken because Plaintiff "cannot contradict his deposition testimony with a sham declaration stating allegations that he has never mentioned, either in his deposition testimony, his EEOC charges, or any of his complaints in this action." (Doc. 105-4 at 2, 3-4) (citing *Yeager*, 693 F.3d at 1081)

Significantly, the Ninth Circuit determined "a district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember." *Yeager*, 693 at 1080. The Court observed a "non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition." *Id.* at 1081 (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d. 989, 998 (9th Cir. 2009)). As a result, "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* However, when there is a great disparity between a declaration and deposition testimony, a court may find a contradiction warranting application of the sham affidavit rule. *Id.* For example, invocation of the sham affidavit rule was appropriate where the plaintiff offered a "weak explanation" for the disparity between his declaration and deposition testimony— saying that he "reviewed several documents that have refreshed [his] recollection"— where the deposition questions concerned "critical issues of his lawsuit." *Id.* at 1080-81.

Plaintiff claims to have suffered racial discrimination while an employee of the CDCR, and contends he suffered "a hostile work environment based on race." (Doc. 93 at 19; *see generally* Doc. 93 at 18-24) Despite racial animosity being a central issue in this action, Plaintiff was unable to recall any events at CCI after April 1999 during his deposition. Nevertheless, Plaintiff now purports to identify several instances—such as comments by officers and "a cartoon type picture" hung by a secretary—that occurred "[w]hile [he] was at CCI." (*See* Doc. 102-2, ¶¶ 9-10, 14-21) Plaintiff offers no explanation for his current clear recollection of events, despite his inability to recall them during his deposition. Under such circumstances, the application of the sham affidavit rule is appropriate. *See Yeager*, 693 F.3d at 1081. Accordingly, Defendants' objections are **SUSTAINED** and Paragraphs 9, 10, and 14-21 are **STRICKEN**.

      c.     Information regarding the inmate housing incident in September 2016

During Plaintiff's deposition, he was questioned regarding a housing incident that occurred in September 2016, during which a GP inmate was housed with an SNY inmate. (Doc. 100-6 at 147, Mack Depo. 274:2-275:2) Specifically, Plaintiff was asked if he was "aware if there was a correctional officer who was injured because an SNY inmate was housed with a general population inmate." (*Id.*) In response, Plaintiff testified:

A. It was my understanding yes, there was an incident.

Q. And where did that incident occur?

A. I do not know. I was not given any information on that, nor was I interviewed nor asked to write a memo.

Q. Who was the officer that was injured, if you know?

A. I don't know that either.
…

Q. Do you have knowledge of whether you were responsible for the placement of either one of those inmates into the cell?

A. And I have no information on that either.
…

Q. And had you, in fact, housed inmates the day before?

A. I don't remember the last time the bus came in that week. No, I don't remember that.

(Doc. 100-6 at 130-132, Mack Depo. 274:6- 275:2, 276:21-24) Further, Plaintiff testified that "Mr.

Madden called [Plaintiff] down… during his overtime shift…and gave [him] a document to appear for an interview [regarding the housing incident] the following week." (*Id.* at 134, Mack Depo. 280:6-15)

In his declaration, Plaintiff identifies information regarding the inmate transport that occurred on September 15, 2016, including where the inmates arrived from, their housing status, and the status of inmates where Plaintiff was filling beds that day. (*See* Doc. 102-2 at 9, Decl. ¶¶ 76-84, 86) In addition, Plaintiff reports that he "was not directed by anyone to participate in an interview about the incident in which any SNY and a General Population housing incident occurred." (*Id.*, ¶ 85) Defendants contend these statements in Plaintiff's declaration should be stricken as sham statements. (Doc. 105-7)

As noted above, Plaintiff does not identify any reason for the differences in his deposition testimony and the information provided in his declaration. There is no information explaining why Plaintiff testified he had "no information" regarding the inmate housing situation and whether he was responsible for their placement, yet in his declaration is able to provide a significant amount of information. For example, Plaintiff now identifies where the inmates came from and their status, as well as where he placed the incoming inmates, and why. Further, Plaintiff's declaration that he was not directed to participate in an interview regarding the situation is a clear and unambiguous contradiction with this deposition testimony Mr. Madden directed Plaintiff to appear for an interview. Given the clear conflicts in the testimony, invocation of the sham affidavit rule is appropriate. *See Yeager*, 693 F.3d at 1081. Accordingly, Defendants' objection to Paragraphs 76-86 of Plaintiff's declaration is **SUSTAINED** and the Paragraphs are **STRICKEN**.

### 2. Lack of personal knowledge

Defendants object to statements in Plaintiff's declaration on the grounds that the statements lack foundation and failure to demonstrate personal knowledge. [4] (Doc. 105-4 at 4-6, 8-10)

Rule 602 provides that a witness may not testify unless "the witness has personal knowledge of the matter." Fed. R. Evid. 602. A lay witness may testify only as to those opinions or inferences which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of

---

[4] Defendants also challenge a statement by David Crounse as lacking foundation. (Doc. 105-4 at 10) However, Plaintiff did not rely upon that statement in his opposition. Likewise, the Court does not refer to the statement in its analysis. Accordingly, Defendants' objection to Paragraph 18 of Mr. Crounse's declaration is **MOOT**.

the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Thus, the Ninth Circuit requires affidavits offered in support of summary judgment be "based on personal knowledge." *Bliesner v. The Commn. Workers of America*, 464 F.3d 910, 915 (9th Cir. 2006).

Plaintiff's challenged statements include information for which he fails to identify the source of his knowledge. For example, Plaintiff purports to identify "less qualified" individuals who were moved "into Acting Lieutenant and Correctional Counselor 1 positions" upon the approval of Defendant Holland. (*See* Doc. 102-2 at 5, ¶¶ 33-38) He also identifies investigations into officers, and addresses the administrative actions taken in response. (*Id.*, ¶¶ 103-115) However, Plaintiff fails to explain his basis for knowledge of the officers' qualifications, assignments, Holland's approval of the positions, or the administrative actions taken. Likewise, Plaintiff's statement that certain information was "common knowledge" at CCI (*see, e.g. id.*, ¶ 90) fails to lay a proper foundation for *his* knowledge. *See Williams v. West Chester*, 891 F.2d 458, 471 (3rd Cir. 1989) (finding testimony based upon "common knowledge," where the record was "devoid of any hint of its source," was inadmissible and "cannot be used to resist a summary judgment motion"). Without a proper foundation to establish how Plaintiff has personal knowledge, his statements are inadmissible.[5]

The Court has reviewed each of the challenged statements agrees Plaintiff fails to lay any foundation for the challenged statements or identify the source of his knowledge. Defendants' objections to Paragraphs 24, 25, 27, 28, 30, 33-39, 72, 90-95, 98, 103, 105-108, and 110-115 of Plaintiff's declaration are **SUSTAINED**, and these paragraphs are **STRICKEN**.

### 3. Legal conclusions

Defendants object to several statements in Plaintiff's complaint as improper legal conclusions. (Doc. 105-4 at 4) Specifically, Defendants challenge statements in the following paragraphs:

> 24. On or about February 15, 2014, my application to Acting Correctional Lieutenant was derailed by Defendant Holland based on my race. No other explanation can be offered for intentionally basing the denial on a nonexistent personnel investigation against me.

---

[5] Moreover, the Court has no information that the plaintiff could elicit admissible evidence on these topics at trial. Indeed, given the potentially devastating impacts of a motion for summary judgment, it appears that if he could produce admissible evidence, he would have done so in opposition to the motion.

29. In August 2014 Defendant Holland reassigned me out of a preferred post and bid assignment in retaliation for his EEOC Charge and related protected activities.

30. In March/April 2016 Defendant Holland denied me an acting Lieutenant position despite Acting Captain Crounse had recommended I be given the opportunity.

(Doc. 105-4 at 4-5)  According to Defendants, "The statement that Holland "derailed" Mack's application 'based on my race' is a legal conclusion." (*Id.* at 4)  In addition, Defendants appear to challenge the conclusion that Ms. Holland reassigned Plaintiff "in retaliation for his EEOC Charge and related protected activities." (*See id.* at 5)

Significantly, whether the actions were taken due to Plaintiff's race and in retaliation for protected activities are legal conclusions related to the claims presented. *See Gonzalez v. City of McFarland*, 2014 U.S. Dist. LEXIS 156596 at *25 (E.D. Cal. Nov. 5, 2014) ("[w]hether an adverse action was taken in retaliation is a legal conclusion").  As this Court explained previously, "improper legal conclusions … are not *facts*." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (emphasis in original). As such, legal conclusions "will not be considered on a motion for summary judgment." *Id.*  Accordingly, Defendants' objections to Paragraphs 24 and 29 are **SUSTAINED** and the portions of the paragraphs containing legal conclusions—that the actions were "based on [Plaintiff's] race" and taken "in retaliation for his EEOC Charge and related protected activities—are **STRICKEN**.  On the other hand, Defendants have not identified any legal conclusion in Paragraph 30, and the objection to it is **OVERRULED**.

4.      Hearsay

Plaintiff asserts, "Several months into my retirement, I learned that the reason CDCR gave my union attorney Lance Folmer for being placed in the mail room was due to a pending EEO investigation." (Doc. 102-2 at 13, Mack Decl. ¶ 119)  Defendants object to Paragraph 119 as inadmissible hearsay.  (Doc. 105-4 at 10)

Hearsay statements are those "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  To the extent Plaintiff offers a statement of Mr. Folmer for its truth, Defendants' objection to Paragraph 119 is **SUSTAINED**.

15

### 5.    Conclusion

The remaining evidentiary objections raised by Defendants are challenges as to the relevance of the facts asserted. However, when evaluating a motion for summary judgment, the Court "cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch*, 433 F. Supp. 2d at 1119. Accordingly, the Court declines to address these objections.

Finally, to the extent that statements offered by either party are speculative or argumentative, the Court, as a matter of course, will not factor that material into its analysis. *See Burch*, 433 F. Supp.2d at 1119 (statements "based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment") (emphasis in original). The Court has relied only upon admissible evidence in evaluating the merits of the motions for summary judgment.

## IV.    Requests for Judicial Notice

The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). In addition, the Court must take judicial notice of a fact "if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(c)(2). Here, Defendants request that the Court take judicial notice of the following documents:

> **Exhibit 1**: Board Resolution and Order of California State Personnel Board regarding SPB Case No. 15-0147; letter of reprimand.
>
> **Exhibit 2**: Board Resolution and Order of California State Personnel Board regarding SPB Case No. 15-0512; five percent salary reduction for six months.
>
> **Exhibit 3**: Board Resolution and Order of California State Personnel Board regarding SPB Case No. 15-1498; five percent salary reduction for ten months.

(Doc. 100-5 at 1-2) Defendants contend judicial notice is proper as the Court may take notice of "matters of public record, including records of administrative agencies." (*Id.* at 2, citing *Del Puerto Water Dist. v. United States Bureau of Reclamation*, 271 F. Supp. 2d 1224, 1233 (E.D. Cal. 2003); *Peterson v. Cal. Dep't of Corrections & Rehab.*, 451 F. Supp. 2d 1092, 1098, fn. 2 (E.D. Cal. 2006))

Importantly, the accuracy of SPB records cannot be reasonably questioned. *See Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80

16

F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981). Moreover, both parties agreed previously that the Court may take judicial notice of the SPB decisions. (*See* Doc. 71 at 4) Accordingly, the request for judicial notice is **GRANTED**.

**V.      Discussion and Analysis**

> **A.      Plaintiff's Title VII Claims**

Plaintiff alleges Defendants are liable for racial discrimination and retaliation in violation of Title VII, as set forth in 42 U.S.C. § 2000e-2. (Doc. 93 at 18-19) Claims for violations of Title VII involve shifting burdens. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). First, the plaintiff bears the burden to establish a prima facie case of employment discrimination. *Id.* at 802; *Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). The evidence may be either direct or circumstantial, and the amount that must be produced to create a prima facie case is "very little." *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes his prima facie case, "the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155; *see also McDonnell Douglas Corp.*, 411 U.S. at 803. If the defendant carries this burden, the inquiry does not end. Rather, the burden shifts back to the plaintiff to demonstrate the reasons proffered by defendant are pretext for the violation of Title VII. *Id.*; *McDonnell Douglas Corp*, 411 U.S. at 805. Thus, the plaintiff has "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him]." *Reeves v. Sanderson Plumbing Products, Inc*. 530 U.S. 133, 142 (2000).

> **1.      Claims against Defendant Kim Holland**

As an initial matter, Plaintiff states the three causes of action arising under Title VII against both CDCR and Holland in her official capacity. (*See* Doc. 93 at 18-19) Holland asserts the Title VII claims against her "fail as a matter of law because individual defendants may not be held liable under Title VII. (Doc. 100-3 at 12, citing *Miller v. Maxwell's Int'l*, 991 F.2d 583, 587 (9th Cir.1993); *Little v. BP Expl. & Oil Co*., 265 F.3d 357, 362 (6th Cir. 2001)). In response, Plaintiff counters that because he "seeks to hold Defendant Holland liable in her Official Capacity as Warden under each of these causes of action," her argument is "not convincing." (Doc. 102 at 6, emphasis omitted)

In *Miller*, the individual defendants argued that they had "no personal liability under Title VII… and [the plaintiff] received all the relief to which she was entitled when she settled her claims with her corporate employer." *Id.*, 991 F.2d at 587. The Ninth Circuit agreed with the defendants, finding Title VII's statutory scheme "indicates that Congress did not intend to impose individual liability on employees." *Id.* The Court found "no reason to stretch the liability of individual employees beyond the respondeat superior principle intended by Congress." *Id.* at 588. Therefore, the Ninth Circuit concluded the plaintiff's "claims against the defendants in their individual capacities properly were dismissed." *Id.* Significantly, as Plaintiff notes, his claims against Holland are not in her individual capacity but rather her official capacity. Thus, the Court's holding in *Miller* is not implicated.

Nevertheless, "claims against …individuals in their official capacity merge into claims against the employer." *Taylor v. ScottPolar Corpo.*, 995 F.Supp. 1072, 1079 (Az. Dist. 1998) (citing *Gary v. Long*, 313 U.S. App. D.C. 403, 59 F.3d 1391, 1399 (D.C. Cir. 1995); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993)); *see also Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("Official-Capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent"). Because claims against an individual in his or her official capacity are "redundant" and "unnecessarily duplicative" of claims against the employer, courts have determined it is appropriate for the claims to be dismissed, and granted summary adjudication in favor of the individual defendants. *See, e.g., Ctr. For Bioethical Reform, Inc. v. Los Angeles County Sheriff Dept.,* 533 F.3d 780, 799 (9th Cir. 2007) (affirming the court's dismal of claims against an officer in his official capacity where he was named in an official capacity and the entity was named as a defendant as well); *Mock v. Cal. Dep't of Corr. & Rehab.*, 2015 WL 5604394 (E.D. Cal. Sept. 22, 2015) (where the plaintiff raised claims against both the Secretary of CDCR and the CDCR, the court found the individual defendant – named in his official capacity– was "an 'improper target'" and dismissed the claims *sua sponte*); *Taylor*, 995 F.Supp. at 1079 (granting summary judgment in favor of the individual defendant where the claims were also made against the entity employer).

As in *Mock* and *Taylor*, Plaintiff brings claims against both Holland in her official capacity and

the entity employer.[6]  Because Plaintiff's claims against Holland that duplicate the claims against the CDCR, entry of summary adjudication in favor of Holland is appropriate for the Title VII claims.  *See Taylor*, 995 F.Supp. at 1079; *see also Gauronski v. Busch Properties*, 1993 U.S. Dist. LEXIS 16254, 63 Fair Empl. Prac. Cas. 81, (C.D. Cal. Oct. 12, 1993) (granting summary adjudication of claims raised against individuals in both their individual and official capacities where the entity was also named, explaining "an employee who commits an unlawful act while acting in an 'official' capacity creates liability for the entity, and not for the individual").  Accordingly, Holland's motion for summary adjudication of the First, Second, and Third Causes of Action is **GRANTED**.

2.     Racial Discrimination

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The Supreme Court determined this guarantees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  A plaintiff may show racial discrimination in violation of Title VII by proving disparate treatment or impact, or by establishing the existence of a hostile work environment. *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991) (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Jordan v. Clark*, 847 F.2d 1368, 1373 (9th Cir. 1988); *EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1392 (9th Cir. 1984)).  In the Fourth Amended Complaint, Plaintiff identifies two claims of racial discrimination under Title VII: disparate treatment and a hostile work environment.  (*See* Doc. 93 at 18-19)

a.     Disparate treatment

"A person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of race." *Cornwell v. Electra Central*

---

[6] On the other hand, Holland *may* be held liable in her official capacity under Title VII, according to the doctrine of respondeat superior, or for injunctive relief.  However, the plaintiff alleges it was Holland—rather than one of her subordinates—who acted unlawfully and neither Holland nor the plaintiff work for the CDCR.  Thus, respondeat superior liability would not apply and the plaintiff cannot obtain injunctive relief—even had he sought this relief—against her.  Thus, the official capacity claim fails.

*Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).  To prevail on a claim of disparate treatment, a plaintiff must first establish a prima facie case that supports an inference of unlawful discrimination. Specifically, a plaintiff establishes a prima facie case of disparate treatment if he shows that (1) he belongs to a class protected by Title VII; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) "the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell,* 493 F.3d at 1028 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

### i.     *Membership in a protected class*

Defendants assert that Plaintiff's claim for disparate treatment fails because "the undisputed facts show that Holland did not know that [Plaintiff] identified as black."  (Doc. 101 at 13) Specifically, "[t]o the extent that Holland thought about Mack's ethnicity at all, she surmised he might be Hispanic." (DSF 8; Holland Depo. 195:18-22)  According to Defendants, "An employer cannot intentionally discriminate …. based on race unless the employer knows the [individual's] race."  (*Id.*, citing *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1988))

In support of this arguments, Defendants cite *Skeeter v. Norfolk*, 681 F. Supp. 1149 (E.D. Va. 1987), where the plaintiff asserted she was terminated from her employment because she was white. The defendants included the city for which she worked and "four individuals, all black, who were employees of the City and supervisors of [the] plaintiff during her employment period."  *Id.* at 1151. The defendants produced evidence showing the plaintiff previously "identified herself as a member of the black race and argued "the individual defendants could not or not would have discriminated against plaintiff because she is white, when they thought she was a member of their own race – black." *Id.* at 1153.

In contrast to the facts in *Skeeter*, though Holland thought Plaintiff was Hispanic, the evidence does not support a conclusion that Holland believed she and Plaintiff were of the same race, such that she would not discriminate against Plaintiff.  Moreover, it is undisputed that even if Plaintiff continued to identify as a Hispanic male—given that his mother is Mexican—Plaintiff would belong a protected class.  *See Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 692 (2017) (finding the plaintiff "presented sufficient evidence that he belongs to a protected class" under Title VII where he was

20

"Hispanic"). Consequently, the Court finds this element is satisfied.

*ii.    Adverse employment actions*

"[A]n adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and citation omitted). The Ninth Circuit has determined "a wide array of disadvantageous changes in the workplace constitute adverse employment actions." *Ray*, 217 F.3d at 1240. For example, adverse employment actions may include a transfer of job duties, undeserved performance ratings, and the dissemination of unfavorable job references. *Id.* at 1241 (citing *Yartzoff*, 809 F.2d at 1376; *St. John v. Employment Development Dept.*, 642 F.2d 273, 274 (9th Cir. 1981); *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997)).

Plaintiff experienced reductions in pay; the denial of his applications for position changes, including promotions and transfers; and position reassignments, including to the Facility E unit and the mail room. (*See, e.g.* Doc. 59 at 2, Mack Decl. ¶¶ 7, 9, 13; DSF 16-19; DSF 27-28; Mack Depo. 170:1-4) Defendants do not dispute that Plaintiff suffered adverse employment actions.

*iii.    Plaintiff's job performance*

Significantly, neither Plaintiff nor the CDCR address whether Plaintiff "performed his job satisfactorily," as his required for a claim for disparate treatment under Title VII. *See Cornwell*, 493 F.3d at 1028 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Nevertheless, the Court notes that Plaintiff reported: "I have always had good performance reports, I have got along with coworkers, received appropriate raises in salary and position, obtained a Letter of Commendation while at CMF, a Letter of Appreciation from CSP Lancaster, and was in good standing so as to participate in specialized training."[7] (Doc. 59 at 2, Mack Decl. ¶ 3) On the other hand, the CDCR notes that Plaintiff "received two previous adverse actions in 2006, before Holland became Warden." (Doc. 101 at 8, n. 1) Thus, there is a dispute regarding whether Plaintiff's job performance was satisfactory. Nevertheless, for purposes of this motion, the Court will treat the element as satisfied.

///

---

[7] The parties are reminded that "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991). In opposing a motion for summary judgment, the burden is on the plaintiff to make a showing that there is evidentiary support for the essential elements of his claims. *Celotex*, 477 U.S. at 322.

To establish a prima facie claim for disparate treatment, Plaintiff must demonstrate he was treated differently than similarly situated individuals. *Cornwell,* 493 F.3d at 1028; *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (2004). Employees "are similarly situated when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641. The employees' roles need not be identical; similarly situated means "similar in all material respects." *Hawn*, 615 F.3d at 1157. The Supreme Court explained, "Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

Plaintiff fails to identify any evidence that he was treated differently than similarly situated employees who were not the same race and/or ethnic backgrounds as Plaintiff. At most, Plaintiff presents evidence that David Crounse, a Caucasian employee, was permitted to *continue* in an Acting positio while a personnel investigation was conducted. (*See* Doc. 64, Crounse Decl. ¶ 19) In contrast, Plaintiff was seeking to *start* in an Acting position while the investigation occurred.[8] Further, there is no evidence that Mr. Crounse displayed conduct similar to Plaintiff, such that the Court could find they were similarly situated when the investigations were pending.

In addition, Plaintiff does not present evidence that other individuals were not placed under investigations for similar misconduct allegations as those made against Plaintiff. Likewise, Plaintiff does not show pending investigations were not reported to other facilities when individuals of other races and ethnic backgrounds applied for lateral transfers or promotions. Because there is no evidence that Plaintiff was treated differently than similarly situated employees who were not of his race, Plaintiff fails to state a prima facie case for disparate treatment under Title VII. Consequently, Defendant's motion for summary adjudication of Plaintiff's First Cause of Action is **GRANTED**.

### b.	Hostile work environment

The Supreme Court determined Title VII is violated "[w]hen the workplace is permeated with

---

[8] The CDCR also presents evidence that, as a policy, it "would not promote employees or place them in higher-level 'acting' positions if they are the subject of a personnel investigation that might lead to an adverse action, or if they have an adverse action pending." (DSF 35) There is no evidence that this policy was inconsistently enforced. Likewise, Plaintiff does not identify evidence supporting a finding that this policy was not enforced for individuals of a different racial or ethnic background than Plaintiff.

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). The Supreme Court instructed courts to consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Morgan,* 536 U.S. at 116 (citation omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted). Further, the requisite level of severity "varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991).

To prevail on a hostile work environment claim, "a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *see also Dawson v. Entek Int'l*, 630 F.3d 928, 939 (9th Cir. 2011). A plaintiff must demonstrate "the conduct at issue was both objectively and subjectively offensive: he must show that a reasonable person would find the work environment to be 'hostile or abusive,' and that he in fact did perceive it to be so." *Dawson*, 630 F.3d at 938 (quoting *Faragher*, 524 U.S. at 787).

Plaintiff alleged that he was subjected to "a hostile work environment based on race" and suffered "race harassment sufficient to alter the terms and conditions of ….[his] employment." (Doc. 93 at 19, ¶¶ 172, 174) Opposing summary judgment, Plaintiff asserts the evidence shows he was "clearly subjected to a hostile work environment." (Doc. 107 at 9, emphasis omitted) He asserts that "racial hostility has been a hallmark of CDCR's employees over a long period of time," and "[i]n his career at CDCR, [Plaintiff] recalls… being shown KKK paraphernalia by another officer who seemed to imply membership." (*Id.*)

During Plaintiff's deposition, he testified that he "was called a white nigger… in the mid 90's" while working at Lancaster and "was shown a Ku Klux Klan card [by] another officer" at Vacaville.

(Doc. 100-6 at 142-143, 434:25- 435:18)  In addition, Plaintiff reported that while he employed at Pelican Bay, he "only counted five [black people]" and on one occasion, the warden would not let him out of his office, stating "what happens at the bay stays at the bay."  (*Id.* at 143, Mack Depo. 435:24-8)  Plaintiff also testified that "a white correctional officer" told him in 1998 that "people like [Plaintiff]" were not hired around Pelican Bay and he "was never going to promote."  (*Id.* at 144, Mack Depo. 436:22-437:6)  Further, Plaintiff reported being "called a nigger in an in-service training" when he transferred to CCI in April 1999.  (*Id.* at 142, Mack Depo. 434:11-16)  When asked if there were "[a]ny other instances" Plaintiff said he could not think of any, and he did not identify any events occurring at CCI after April 1999.  (*Id.* at 145, Mack Depo. 437:7-8)

Importantly, though objectively and subjectively offensive, the alleged conduct was not physically threatening, and Plaintiff does not present evidence that it interfered with his work performance at these facilities.  *See Morgan,* 536 U.S. at 116; *Dawson*, 630 F.3d at 938.  Similarly, in *Vasquez*, the Ninth Circuit noted the plaintiff asserted the defendant "continually harassed him but provide[d] specific factual allegations regarding only a few incidents."  *Vasquez*, 349 F.3d at 642.

In *Vasquez*, the Ninth Circuit noted the plaintiff complained about harassing racially-related epithets and conduct "which occurred over the course of more than one year."  *Vasquez*, 349 F.3d at 644.  The Court determined the offensive remarks were not severe or pervasive enough to create a hostile work environment.  *Id.*  Further, in *Sanchez v. City of Santa Ana*, the Ninth Circuit upheld a district court's decision that no hostile work environment existed where "the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino."  *Vasquez*, 349 F.3d at 643 (citing *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031, 1036 (9th Cir. 1990)).

Moreover, the facts now before the Court are much less egregious than *Sanchez* in which the Court found the plaintiff did not establish a hostile work environment.  Indeed, Plaintiff identifies only a few incidents, none of which occurred after April 1999.  There is no evidence that the conduct was physically threatening, and did not interfere with his work performance at CCI.  Even if it was, these events, almost two decades in the past, cannot demonstrate that during a time period relevant to this

lawsuit, that he suffered a hostile work environment. Consequently, Plaintiff fails present evidence sufficient to support a prima facie case for a hostile work environment, and Defendant's motion for summary adjudication of Plaintiff's Second Cause of Action is **GRANTED**.

### 3.    Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this [title] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]. . . ." 42 U.S.C. § 2000e-3(a).  Thus, an "employer can violate the anti-retaliation provisions of Title VII in either of two ways: (1) if the adverse employment action occurs because of the employee's opposition to conduct made unlawful [by Title VII]; or (2) if it is in retaliation for the employee's participation in the machinery set up by Title VII to enforce its provisions." *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997).

#### a.    Plaintiff's prima facie case

To establish a claim for retaliation in violation of Title VII, a plaintiff must show: (1) he engaged in protected activity; (2) his employer subjected him to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.  *Bleeker v. Vilsack*, 468 Fed. App'x 731, 732 (9th Cir. 2012); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

##### i.    Protected activity

For an employee's "opposition" to be protected, the conduct that the employee opposed "must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Learned v. Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988).  Conduct constituting a "protected activity" under Title VII includes filing a charge or complaint, testifying about an employer's alleged unlawful practices, and "engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)) (internal quotation marks omitted).  Here, the CDCR does not dispute that Plaintiff engaged in a protected activity through the filing of EEOC complaints.  Accordingly, this element is satisfied.

##### ii.    Adverse employment action

As noted above, adverse employment actions "materially affect[] the compensation, terms,

conditions, or privileges of employment." *Davis*, 520 F.3d at 1089. This element is satisfied, because Plaintiff experienced reductions in pay, the denial of promotional opportunities, and transfers to different facilities within CCI. (*See, e.g.* Doc. 59 at 2, Mack Decl. ¶¶ 7, 9, 13; DSF 16-19; DSF 27-28; Mack Depo. 170:1-3) Further, Defendants do not dispute that Plaintiff suffered adverse employment actions.

### iii.    Causal link

The requisite causal link between protected activity and an adverse employment action may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff*, 809 F.2d at 1375. Notably, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1065 (9th Cir. 2002).

Because the Court is obligated to interpret the evidence most favorably to the non-moving party, given the short period of time between protected actions—including the filing of grievances and EEOC complaints—and the initiation of personnel investigations against Plaintiff that resulted in adverse employment actions, a causal link may be inferred. *See, e.g., Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (inferring causation where adverse employment actions took place less than three months after the plaintiff's complaint where his supervisors were aware of his Title VII charges and his participation in administrative investigations); *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within months of protected activity where supervisor knew of the employee's complaint). Accordingly, the Court finds that Plaintiff presents evidence sufficient to support a prima facie case for retaliation in violation of Title VII.

### b.    Reasons set forth by Defendants

Because Plaintiff met his burden to establish a prima facie case, the burden of production shifts to the CDCR "to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155. Defendant contends the adverse actions taken by the CDCR were legitimate and upheld by the State Personnel Board following evidentiary hearings. (Doc. 101 at 15) Defendant

observes,

> With respect to the adverse actions taken against him for sleeping on the job, refusing to work with a woman and leaving his post, Mack appealed those decisions to the SPB. After full adversary hearings, the SPB ruled that CDCR properly imposed discipline on Mack for his violations of the California Government Code.

(*Id.*)

Specifically, an administrative law judge reviewed the charge that Plaintiff did not want to work with Correctional Officer T. Schuler because she is female. (Doc. 100-5 at 5) On June 29, 2015, the ALJ issued a decision finding Plaintiff's "conduct does constitute cause for discipline under Government Code section 19572, subdivision (t) [for] failure of good behavior." (*Id.* at 13) The SPB adopted the findings of the ALJ. (*Id.*at 17) In addition, after investigating the allegations against Plaintiff for leaving his post, the SBP determined Plaintiff's "conduct constitute[d] legal cause for discipline" for "inexcusable neglect of duty," "insubordination," "discourteous treatment of the public or other employees," "willful disobedience, and … other failure of good behavior." (DSF 27-28; Doc. 100-5 at 60) Because the State Personnel Board held evidentiary proceedings and determined Plaintiff engaged in conduct that was cause for discipline, the CDCR has identified legitimate reasons for the adverse employment decisions.

In addition, the CDCR presents evidence that Plaintiff's temporary reassignment to the mailroom was "consistent with CDCR's policy of removing a peace officer from his or her custodial duties pending an investigation into a serious policy violation involving inmate safety." (Doc. 100-11 at 3, Vazquez Decl. ¶8) Thus, the CDCR identified a legitimate reason for the reassignment.

### c. Plaintiff's burden to show the reasons are pretext

Upon Defendant's showing that the termination was based upon legitimate, business reasons, Plaintiff must "raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext." *Hawn*, 615 F.3d at 1155-56. A plaintiff must do more than simply deny the credibility of reasons offered by the defendant. *See Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). "A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641; *see also Coghlan v. Am. Seafoods*

*Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).

Plaintiff contends the reasons offered by the CDCR "were pretextual efforts to hide impermissible discriminatory and retaliatory motives." (Doc. 107 at 8) In support of this assertion, Plaintiff asserts he "was treated significantly different than similarly situated individuals … because he had made complaints regarding race discrimination." (*Id.*) However, Plaintiff fails to identify any direct evidence of his assertion, such as retaliatory statements by the employer. *Coghlan*, 413 F.3d at 1095. Indeed, though Plaintiff asserts Holland initiated the adverse actions and "derailed" his applications for positions outside of CCI, he also admitted that he "had very little contact" with Holland during his employment at CCI. (*See* Doc. 105-4 at 4, Mack Decl. ¶ 24; DSF 8, Mack Depo. 69:5-75:21) In addition, Holland did not "make any disparaging or negative comments to [Plaintiff] of any kind." (DSF 13)

Likewise, Plaintiff fails to identify indirect evidence, which requires an additional inferential step," to establish retaliation. *Coghlan*, 413 F.3d at 1095. For example, a plaintiff may rely upon a comparisons with other similarly situated to provide an inference of a retaliatory motive. *See Hawn* , 615 F.3d at 1156. Here, Plaintiff fails to present evidence that others similarly situated did not suffer comparable adverse actions or personnel investigations while Holland was the Warden at CCI. Likewise, there is no evidence that supports the conclusion that Vazquez had a retaliatory motive in reassigning Plaintiff to the mailroom. To the contrary, when Acting Warden Vazquez initiated the investigation into the inmate housing incident and directed Plaintiff's reassignment to the mailroom, she was unaware that Plaintiff "had filed charges against CDCR when the Equal Employment Opportunity Commission or any other agency, or that he had claimed that CDCR had retaliated or discriminated against him." (Doc. 100-11 at 3, Vazquez Decl. ¶ 9) Though the plaintiff asserts that Vazquez had to have known, due to her position as the Acting Warden, there is no evidentiary support for this position.

Because Plaintiff fails to present direct or indirect evidence of pretext, he also fails to present a triable issue of material fact. Therefore, Defendant's motion for summary adjudication of the Third Cause of Action is **GRANTED**.

///

28

1      **B.      Violations of 42 U.S.C. § 1981**

2          Plaintiff contends Holland is liable for discrimination and retaliation in violation of 42 U.S.C. §

3      1981 (Doc. 93 at 20-21), which "prohibits discrimination in the benefits, privileges, terms and

4      conditions of employment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008)

5      (internal citation, quotation marks omitted).  Holland asserts the Fourth and Fifth Causes of Action for

6      Section 1981 violations "fail for lack of evidence," arguing Plaintiff "has no evidence of either racial

7      discrimination or retaliation."  (Doc. 100-3 at 12)

8          In general, to establish a claim under Section 1981, the evidence must show "(1) [the plaintiff]

9      is a member of a racial minority; (2) the defendant intended to discriminate against plaintiff on the

10     basis of race by the defendant; and (3) the discrimination concerned one or more of the activities

11     enumerated in the statute (i.e., the right to make and enforce contracts, sue and be sued, give evidence,

12     etc.)." *Peterson v. State of Cal. Dep't of Corr. & Rehab.*, 451 F. Supp. 2d 1092, 1101 (E.D. Cal. 2006)

13     (citation omitted).  Significantly, in the Ninth Circuit, "[w]hen analyzing § 1981 claims, [courts] apply

14     the same legal principles as those applicable in a Title VII disparate treatment case." *Surrell*, 518 F.3d

15     at 1103 (internal quotation marks omitted); *see also Johnson v. Riverside Healthcare Sys., LP,* 534

16     F.3d 1116, 1122 & n.3 (9th Cir. 2008) ("[h]ostile work environment claims under Title VII contain the

17     same elements of a § 1981 hostile work environment claim and, thus, the legal principles guiding a

18     court in a Title VII dispute apply with equal force in a § 1981 action").

19         As set forth above, Plaintiff fails to present evidence to support the conclusion that he suffered

20     violations of Title VII, or that the Holland intended to discriminate against him on the basis of

21     Plaintiff's race.  Consequently, the Court also finds his claims for discrimination and retaliation in

22     violation of Section 1981 also fail.  *See Surrell*, 518 F.3d at 1103.  Accordingly, Holland's motion for

23     summary adjudication of Plaintiff's Fourth and Fifth Causes of Action is **GRANTED**.

24     **C.      Retaliation in Violation of 42 U.S.C. § 1983**

25         Plaintiff contends Holland is liable for violating his civil rights rising under the First and

26     Fourteenth Amendments of the Constitution of the United States, and should be held liable pursuant to

27     42 U.S.C. § 1983. (Doc. 93 at 21-22)

28         Section 1983 "is a method for vindicating federal rights elsewhere conferred."  *Albright v.*

*Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege he suffered a specific injury and show a causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

### 1. Discrimination under the Fourteenth Amendment

The Equal Protection Clause requires that all persons who are similarly situated should be treated alike. *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (2001); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based upon membership in a protected class, or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *See Lee*, 250 F.3d at 686; *Barren v. Harrington*, 152 F.3d 1193, 1194 (1998); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (2005).

Because Plaintiff fails to identify evidence of intentional discrimination based upon race, or present evidence supporting the conclusion that similarly situated individuals were treated differently, his claim for discrimination under the Fourteenth Amendment fails. Accordingly, Holland's motion for summary adjudication of the Section 1983 claim, to the extent it is based upon a violation of the Fourteenth Amendment, is **GRANTED**.

### 2. Retaliation under the First Amendment

The First Amendment forbids government officials from retaliating against individuals for speaking out." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). The Supreme Court

explained: "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted). The Ninth Circuit set forth the five-step inquiry to determine whether a public employee's First Amendment rights were violated:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Holland asserts that Plaintiff's First Amendment claim fails because "he did not speak as a private citizen about matters of public concern." (Doc. 100-3 at 16-17)

### a. Speech as a private citizen or public employee

"Statements are made in the speaker's capacity as [a] citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Eng*, 552 F.3d at 1071 (internal quotation marks and citations omitted). In other words, "speech which 'owes its existence to an employee's professional responsibilities' is not protected by the First Amendment." *Huppert v. City of Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).

There is no evidence before the Court that Plaintiff had professional duty to file the grievances or EEO complaints. Thus, it appears Plaintiff was acting as a private citizen rather than a public employee.

### b. Matter of public concern

Whether an employee's expression may be characterized as a matter of public concern "must be determined by the content, form and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987) (citation omitted). "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1071 (quoting *Johnson v. Multnomah County, Oregon*,

48 F.3d 420, 422 (9th Cir. 1995) (internal quotations omitted)). Although this definition is broad, "there are limits." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). The Ninth Circuit explained: "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Id.* (quoting *Multnomah County*, 48 F.3d at 425).

In general, issues of "public concern" include "matters relating to the functioning of government '[such as] misuse of public funds, wastefulness, and inefficiency in managing and operating government entities.'" *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008), quoting *Multnomah County*, 48 F.3d at 425). In addition, a "public concern" may be shown where a statement "helps the public evaluate the performance of public agencies," such as "speech alleging that the government engaged in discrimination or other civil rights violations." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103-04 (9th Cir. 2011) (citations omitted). Thus, the filing of "a police report to complain about police misconduct" is a matter of public concern, and is constitutionally protected speech. *Doe v. County of San Mateo*, 2009 U.S. Dist. LEXIS 26084 at *17-18 (N.D. Cal. Mar. 19, 2009). On the other hand, speech concerning "individual disputes and grievances and that would be of no relevance to the public's evaluation of the performance of government agencies, is generally not of public concern." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 924 (9th Cir. 2004) (citation omitted).

Plaintiff argues that "[c]omplaining about a government's racially discriminatory and illegal retaliatory conduct is clearly a textbook example of speech involving a public concern." (Doc. 107 at 12) Significantly, however, Plaintiff fails to identify what specific speech he believes contained a matter of public concern. To the extent Plaintiff refers to his EEO complaints, there is no showing that they involved more than allegations of a personal nature. In his "Charge of Discrimination" dated July 4, 2014, Plaintiff assert that he believed he was "discriminated against because of [his] race, Black" when his requests for lateral transfer to the California Men's Colony and "acting" time were denied. (Mack Depo., Exh. 12) Likewise, in the "Charge of Discrimination" dated September 23, 2014, Plaintiff asserted he was "retaliated against for engaging in a protected activity and discriminated

32

against because of [his] race." (Mack Depo. Exh. 14) Plaintiff in no way implicates governmental policy in these charges.

Previously, this Court explained that "unless plaintiffs can demonstrate that their verbal protests and EEO complaints addressed broad policies and practices rather than just their personal concerns, they do not constitute speech on a matter of public concern." *Davis v. Cal. Dep't of Corrections*, 1996 U.S. Dist. LEXIS 21305 at *45, 1996 WL 271001 (E.D. Cal. Feb. 23, 1996). When, as here, the allegations address a plaintiff's individual disputes with this employer, public concern is not implicated. *See id; see also Clairmont*, 632 F.3d at 1103-04. Accordingly, the Court finds Plaintiff fails to present evidence supporting the conclusion that he spoke on matters of public concern in support of his claim for a violation of the First Amendment.

Due to Plaintiff's failure "to make a showing sufficient to establish the existence of an element essential" to the claim, Holland's motion for summary adjudication of the Sixth Cause of Action is **GRANTED**.

## VI.    Conclusion and Order

As set forth above, Defendants carry their burden to demonstrate there are no triable issues of fact related to Plaintiff's claims of discrimination and retaliation. In addition, because Plaintiff fails to present evidence sufficient to support his claims for discrimination, summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Based upon the foregoing, the Court **ORDERS**: Defendants' motions for summary judgment (Docs. 100, 101) are **GRANTED**.

IT IS SO ORDERED.

Dated:    **February 16, 2018**              **/s/ Jennifer L. Thurston**
                                            UNITED STATES MAGISTRATE JUDGE

33